**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
　　　　　　　　　　　　　　　　　　　　　　　　 )
**Darrie Holmes,**　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　　　　 )
　　　　**Plaintiff,**　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　**v.**　　　　　　　　　　　　　　　 )　　　**Civil No. 1:14-cv-01366 (APM)**
　　　　　　　　　　　　　　　　　　　　　　　　 )
**Branch Banking and Trust Company,**　　　　 )
　　　　　　　　　　　　　　　　　　　　　　　　 )
　　　　**Defendant.**　　　　　　　　　　　　　 )
_____ )

## MEMORANDUM OPINION AND ORDER

## I.　INTRODUCTION

Plaintiff Darrie Holmes filed this lawsuit against her former employer, Defendant Branch Banking and Trust Company, alleging discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* Plaintiff asserts that Defendant discriminated against her by terminating her employment on the basis of her gender and by failing to provide her equal compensation in comparison to younger, male employees. In response, Defendant claims that it fired Plaintiff, not based on her gender, but because she engaged in conduct that violated bank policies and that her salary was not discriminatory.

This matter is before the court on Defendant's Motion for Summary Judgment. Having reviewed the pleadings and evidence, the court finds that no reasonable factfinder could conclude (1) Defendant discriminated against Plaintiff when it terminated her employment or (2) it discriminated against her by paying her a lower salary on account of her age. However, the court finds that a reasonable jury could find in Plaintiff's favor on her gender-based wage discrimination

claim.  Accordingly, the court grants in part and denies in part Defendant's Motion for Summary

Judgment.

## II.      BACKGROUND

### A.      Factual Background

In November 2004, Defendant Branch Banking and Trust Company ("BB&T") hired

Plaintiff to work as a Teller in its Metro Center branch in Washington, D.C., at a monthly salary

of $1,213.34.  Def.'s Stmt. of Material Facts, ECF. No. 22 [hereinafter Def.'s Stmt], ¶ 17; Pl.'s

Stmt. of Material Facts, ECF No. 25 [hereinafter Pl.'s Stmt.], ¶ 17; Def.'s Mot. for Summ. J., ECF

No. 22 [hereinafter Def.'s Mot.], Ex. 3, ECF No. 22-3 [hereinafter Bayly Decl.], at 23.  Upon

accepting employment with Defendant, Plaintiff acknowledged that she understood, and certified

that she would follow throughout the course of her employment, Defendant's policies, including

its Code of Ethics.  Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19.

In February 2006, Defendant promoted Plaintiff from the position of Teller to the position

of Relationship Banker I and increased her monthly salary to $1,296.66.  Def.'s Stmt. ¶ 21; Pl.'s

Stmt. ¶ 21; Bayly Decl. at 23.  Relationship Bankers are primarily responsible for interfacing with

both new and existing clients, opening and closing client accounts, and managing client safe

deposit boxes.  Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 5.  In addition to providing those client services,

Relationship Bankers are also expected to make daily "cold calls" to both current and prospective

clients in an effort to generate new client accounts.  Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.  Defendant

awards incentive points for each new client account opened and takes into account the points

accumulated when evaluating the employee's performance.  Def.'s Stmt. ¶ 8; Pl.'s Stmt. ¶ 8.

Upon her promotion, Plaintiff received training on her new job duties, as well as

Defendant's policies and procedures governing the opening and servicing of client accounts.

Def.'s Stmt. ¶¶ 22–23; Pl.'s Stmt. ¶¶ 22–23.  Those procedures included the Client Identification Program ("CIP"), which requires, among other things, that to open an account a Relationship Banker must obtain and submit certain client identification and authorization documentation, including a client signature card.  Def.'s Stmt. ¶¶ 11–14, 16; Pl.'s Stmt. ¶¶ 11–14, 16.  At all times during her employment, Plaintiff understood that she was required to obtain such authorization documentation before opening a new account and that opening an account without client consent constituted grounds for termination.  Def.'s Stmt. ¶¶ 24–25; Pl.'s Stmt. ¶¶ 24–25.

In May 2006, Plaintiff was again promoted, this time to the position of Relationship Banker II, and received a salary increase to $1,361.45 per month.  Def.'s Stmt. ¶ 26; Pl.'s Stmt. ¶ 26.  Relationship Banker Is and IIs share the same job responsibilities, but Relationship Banker IIs are typically paid a higher salary and are expected to generate a higher volume of new client accounts than Relationship Banker Is.  Def.'s Stmt. ¶ 6; Pl.'s Stmt. ¶ 6.  During her time as a Relationship Banker II, Plaintiff was responsible for training newly hired Relationship Banker Is at the Metro Center Branch.  One of her trainees was David Arriola—a 26 year-old man—who was hired in June 2006 at a monthly salary of $1,500.00.  Pl.'s Counter-Stmt. of Material Facts, ECF. No. 22, ¶¶ 28, 33; Bayly Decl. at 25.

In August 2006, three months after her promotion, Plaintiff was disciplined for violating both the CIP Policy and the BB&T Code of Ethics because she had failed to obtain the identification documents necessary to verify a client's identity at account opening.  Def.'s Stmt. ¶ 27; Pl.'s Stmt. ¶ 27; Pl.'s Opp'n, Ex. 5, ECF. No. 25-5, at 21.  Despite this violation, Plaintiff received another raise in November 2006, which increased her salary to $1,436.45 per month. Bayly Decl. at 23.

In July 2007, Defendant hired Richard Patterson as Financial Center Leader at the Metro Center Branch. Def.'s Stmt. ¶ 31; Pl.'s Stmt. ¶ 31. As the new Financial Center Leader, Patterson reported directly to Ouattra Daouda, the Sales and Service Leader; Daouda reported to Maria Salter, the Retail Banking Manager. Def.'s Stmt. ¶¶ 32–33; Pl.'s Stmt. ¶¶ 32–33. Plaintiff reported directly to Patterson. Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶ 18; Def.'s Mot., Ex. 8, ECF No. 22-8, at 2. Plaintiff and Patterson incidentally knew each other from Relationship Banker training and had maintained a friendly relationship after that training. Def.'s Stmt. ¶¶ 34–36; Pl.'s Stmt. ¶¶ 34–36. Plaintiff asserts, however, that Patterson became increasingly abusive towards her and other branch employees in the months after becoming supervisor. Def.'s Stmt. ¶¶ 76–80, 82–83; Pl.'s Stmt. ¶¶ 76–80, 82–83. Patterson nevertheless gave Plaintiff a highly favorable performance review in October 2007, and increased her monthly salary to $1,666.66—an approximately 16 percent raise—in November 2007. Def.'s Stmt. ¶¶ 38–39; Pl.'s Stmt. ¶¶ 38–39; Bayly Decl. at 23.

Shortly after authorizing that raise, Patterson received a complaint from one of Plaintiff's clients—K.K.—alleging that Plaintiff had opened an account in his name after he had expressly told her not to do so. Def.'s Stmt. ¶ 41.[1] Patterson immediately contacted the Regional Associate Relations Manager, Terrence Bayly, who instructed Patterson to verify and investigate K.K.'s complaint. Def.'s Stmt. ¶¶ 43–44; Pl.'s Stmt. ¶¶43–44. Patterson then obtained a list of all accountholders for whom Plaintiff had opened an account and for which a signature card was missing. Patterson contacted the accountholders and, upon doing so, discovered an additional six customers that had not authorized the opening of a new account. Def.'s Stmt. ¶¶ 45–47. Patterson

---

[1] Although Plaintiff "denies" this fact, Pl.'s Stmt. ¶ 41, she has offered no evidence to dispute that K.K. actually spoke to Patterson and accused Plaintiff of opening an account without his consent. The court, therefore, treats that asserted fact as undisputed. Plaintiff likewise disputes other facts relating to Patterson's subsequent investigation on the ground that she denies opening accounts without clients' consent. *See, e.g.*, Pl.'s Stmt. ¶¶ 45–50. Plaintiff does not, however, offer any evidence to contradict the investigatory steps taken by Patterson or what other clients reported to him. As will be explained below, whether Plaintiff in fact opened an account for K.K. or other customers without their consent is not a material fact.

obtained statements via email from each of those six clients verifying that he or she had not authorized the account opening. Def.'s Stmt. ¶¶ 48–50. None of those clients, however, identified Plaintiff by name. *See* Bayly Decl. at 28–39. One client, C.C., did report that the same "young lady" who had contacted her about opening a new account, and whom she had instructed not to open an account, also happened to be the person to whom she spoke to close the account. *Id.* at 33. C.C. recalled that, upon requesting to close the account, the bank employee "recommended that I keep the account open and advised that it wouldn't cost me anything." *Id.*

Patterson concluded that Plaintiff had opened the customer accounts in question without client consent. He reached that conclusion based on BB&T's internal records, which identified Plaintiff, through her employee identification number, as the bank employee associated with the accounts in question. Def.'s Stmt. ¶¶ 48–50; Def.'s Mot., Ex. 6, ECF No. 22-6 (records pertaining to customer accounts with missing signature cards); *see also* Bayly Decl. at 43–44 (summary bank record, generated for purposes of discovery, showing Plaintiff's employee number—"43010"— associated with client accounts at issue).

After the investigation concluded on January 25, 2008, Plaintiff met with Patterson, Bayly, Daouda, and Salter to discuss the allegations lodged against her. Def.'s Stmt. ¶ 54; Pl.'s Stmt. ¶ 54. Plaintiff steadfastly denied opening any client accounts without authorization. Def.'s Stmt. ¶ 55; Pl.'s Stmt. ¶ 55. After that meeting, Patterson, Bayly, Daouda, and Salter met again and decided to terminate Plaintiff for violating the BB&T Code of Ethics by opening client accounts without consent. Def.'s Stmt. ¶ 60. Defendant officially terminated Plaintiff's employment that same day. *Id.*

### B.      Procedural Background

Plaintiff timely filed suit in this court on August 11, 2014, alleging discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  *See* Compl., ECF No. 1, ¶ 38.[2]  The crux of Plaintiff's claims is that Defendant (1) terminated her employment because of her gender (Count Two) and (2) provided her unequal compensation because of both her age and gender (Counts One and Four).

Following discovery, Defendant filed a Motion for Summary Judgment, arguing that it had not discriminated against Plaintiff when setting her salary and had fired her for a legitimate non-discriminatory reason—she had opened several accounts without client permission in violation of bank policies and procedures.  *See* Def.'s Mot. at 28–29.  Plaintiff opposed Defendant's Motion, claiming that its proffered non-discriminatory reasons for both compensating her unequally and firing her were pretext for discrimination.  *See generally* Pl.'s Opp'n.

## III.    LEGAL STANDARD

Summary judgment will only be granted if the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A non-material factual dispute is insufficient to prevent the court from granting summary judgment.  *Id.*

---

[2] By Order entered on May 15, 2015, the court dismissed Plaintiff's race discrimination and retaliation claims, asserted in Counts Three, Five, and Six of the Amended Complaint, as well as Count Seven under the District of Columbia Human Rights Act.  Consequently, only Counts One, Two, and Four, which allege gender and age discrimination, remain.  *See* Order, ECF No.7.

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record that it believes "demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation mark omitted). The nonmoving party may oppose the motion using "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which [the Court has] referred." *Celotex Corp.*, 477 U.S. at 324.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  However, "to defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324).  In other words, if the non-movant's evidence is "merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).  Summary judgment, then, is appropriate when the nonmoving party fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## IV.    DISCUSSION

Plaintiff alleges gender and age discrimination in violation of Title VII and the ADEA, respectively.  Under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Nor may an employer "limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."  *Id.* § 2000e-2(a)(2).  Similarly, under the ADEA, an employer may not "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age," 29 U.S.C. § 623(a)(1), nor may it, "limit, segregate, or classify [its] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age," *Id.* § 623(a)(2).

Plaintiffs who are able to provide direct evidence of discrimination—e.g., "a statement that itself shows racial or gender bias in the [employment] decision"—are "generally entitle[d] to a jury trial."  *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).  In the absence of direct evidence of discrimination, however, Title VII and ADEA claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999).  The plaintiff bears the burden of proving a prima facie case of discrimination; if he does so, then the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment

action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If the defendant advances a legitimate non-discriminatory reason for the action taken, then the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253.

In the summary judgment context, however, once an employer sets forth a legitimate non-discriminatory reason for the employment action, "whether the employee actually made out a prima facie case is no longer relevant, and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (internal quotations omitted); *accord Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016). At that point, the court must determine whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race" or some other prohibited ground. *Brady*, 520 F.3d at 494; *accord Nurriddin*, 818 F.3d at 758 ("The 'one central inquiry' that remains is whether a reasonable jury could infer retaliation or discrimination from the evidence."). Courts should consider this issue "in light of the total circumstances of the case," asking whether discrimination might be inferred from "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (internal quotation marks omitted); *see also Nurriddin*, 818 F.3d at 759. This burden-shifting framework applies equally to claims of discrimination based on salary disparity. *See Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999).

Here, Plaintiff's discrimination claims boil down to two assertions: (1) Defendant's reason for terminating her—namely, that she violated applicable policies and procedures—was pretext for gender discrimination in violation of Title VII, and (2) Defendant discriminated against her on account of her age and gender by paying her less than younger, male Relationship Bankers in violation of Title VII and the ADEA. The court addresses each of those claims in turn.

### A.      Plaintiff's Title VII Gender Discrimination Claim

As a threshold matter, Plaintiff challenges whether Defendant has offered admissible evidence to support its non-discriminatory reason for her firing. *See* Fed. R. Civ. P. 56(c)(2) (allowing parties to object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"). Specifically, she argues that the customer statements obtained by Patterson via email are hearsay. She similarly contends that the internal bank records associating Plaintiff's employee number with the seven accounts opened without customer consent, Def.'s Mot., ECF No. 22-6, Bayly Decl. at 43–44, are also hearsay. *See* Pl.'s Opp'n at 32–33. The court rejects Plaintiff's evidentiary contentions.

With respect to the third-person client statements, the Court of Appeals has made clear that, "[o]nce the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks omitted). Thus, as Defendant correctly contends, the client statements are not being admitted here to prove the truth of the matters asserted by the clients, but rather to establish Defendant's good-faith belief in the non-discriminatory reason it has offered for Plaintiff's termination. *See Crockett v. Abraham*, 284 F.3d 131, 134 (D.C. Cir. 2002) (finding that information provided to a decision-maker by a merits-selection committee was not

"offered for the truth of the matters asserted," but to explain the "decisionmaking . . . under challenge"); *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 93, 98 n.10 (D.D.C. 2007) (admitting two third-party statements concerning the plaintiff's performance for the purpose of explaining why the third-parties believed the plaintiff's termination "was necessary and appropriate") (citing *Crockett*).

As for the internal bank records linking Plaintiff to the customer accounts in question, those records are capable of being admitted under the business-records exception to the rule against hearsay. *See* Fed. R. Evid. 803(b); *Wilburn v. Robinson*, 480 F.3d 1140, 1143 (D.C. Cir. 2007) (stating that, at summary judgment, the evidence must be "capable of being converted into admissible evidence"). The record contains sufficient evidence from which the court can infer that Defendant compiled data as a matter of course concerning (1) newly opened accounts that lacked signature cards and (2) the employees associated with those accounts. *See* Def.'s Mot., Ex. 1, ECF No. 22-1, at 6–7, 31–33; Def.'s Mot., Ex. 2, ECF No. 22-2, at 10–11. Alternatively, like the client emails, the records are not offered to prove the truth of their contents, but instead, are admissible to show the type of information Patterson and others relied upon during the investigation and before deciding to terminate Plaintiff.[3]

Having concluded that Defendant has carried its burden of offering a non-discriminatory reason for Plaintiff's termination with admissible evidence, the court turns to whether Plaintiff has produced evidence sufficient to rebut that explanation. *See Brady*, 520 F.3d at 495. Plaintiff makes two arguments to establish that Defendant intentionally discriminated against her. First, she asserts that the bank's rigorous system of internal controls rendered it virtually impossible for

---

[3] In her briefing, *see, e.g.* Pl.'s Opp'n at 7, 33, Plaintiff suggests that Defendant's failure to produce certain records compels the denial of summary judgment. Plaintiff has not, however, established any facts that would support making an adverse inference from the mere absence of evidence. *See Smith v. Napolitano*, 626 F. Supp. 2d 81, 101 (D.D.C. 2009).

her to open accounts without customer consent.  Based on that evidence, she contends, a reasonable factfinder could conclude Defendant's proffered non-discriminatory explanation for her firing was false.  Second, she argues that a reasonable juror could infer discriminatory intent from Patterson's express acts of gender bias.  *See* Pl.'s Opp'n at 30–36.  The court finds that neither argument enables Plaintiff to survive summary judgment.

1.     *Whether the Merits of the Discipline Committee's Decision Support an Inference of Pretext*

Plaintiff offers five reasons why the decision made by Patterson, Bayly, Daouda, and Salter (the "Discipline Committee") was so obviously wrong that it supports an inference of pretext.  She contends that (1) "the failure by defendant to flag [Plaintiff] for noncompliance at any [earlier] point . . . would entitle a jury to conclude that [she] was in compliance with each and every account that she opened during this period"; (2) "it was indeed 'not possible' for her to be out of compliance [with CIP for] so many accounts for so long a period [without being uncovered by CIP]"; (3) "only one of the purported seven clients could actually identify [her] by name"; (4) Defendant's "reluctance to involve [BB&T investigators] in a matter that could, if true, trigger serious issues . . . is impossible to understand"; and (5) Defendant did not adequately "assess[] her defense" that her "partners in lending and brokerage," such as wealth management advisors, could have been responsible for the documentation deficiencies with the accounts in question.  Pl.'s Opp'n at 32–35.  These contentions, boiled down to their essence, amount to one—the Discipline Committee's determination was so "egregiously wrong . . . [that it constitutes] an error too obvious to be unintentional." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015) (internal quotation mark omitted); *see* Pl.'s Opp'n at 34 (arguing that "no Relationship Banker would

believe such a scheme would be remotely successful" and that avoiding detection when opening accounts without consent is "impossible" to do).

The court rejects that contention.  "If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts."  *Brady*, 520 F.3d at 495. Therefore, the question here is not whether Plaintiff in fact violated the bank's policies by opening unauthorized accounts, but rather, whether the Discipline Committee honestly and reasonably believed that she had done so.  *See DeJesus v. WP Company LLC*, No. 15-7126, 2016 WL 6694952, at *5 (D.C. Cir. Nov. 15, 2016) (emphasizing that the decision-maker must both reasonably *and* honestly believe that the employee committed a transgression); *Brady*, 520 F.3d at 495 (finding that summary judgment was proper where the plaintiff "did not produce evidence sufficient to show that [his employer's] conclusion was dishonest or unreasonable").

In its motion, Defendant presented ample evidence that it had received a customer complaint accusing Plaintiff of opening a new account without the client's consent, which triggered a broader investigation into Plaintiff's conduct.  That investigation, led by Patterson, uncovered several other instances of similar misconduct, which were supported by client statements and internal bank records.  Def.'s Stmt. ¶¶ 41–52.  Ultimately, based on that evidence, Patterson and others concluded that Plaintiff's actions warranted her firing.  *Id*. ¶¶ 58-59.  That decision was reasonable in light of the evidence collected.

Plaintiff's contention concerning the rigor of Defendant's internal controls does not compel a contrary conclusion.  Indeed, her assertion that the bank's internal controls were so rigorous as to render it virtually impossible to open accounts without consent is belied by the fact that, around the same time, Defendant fired two other bank employees for similar misconduct—both of whom

were men.  Def.'s Stmt. ¶ 88.  Additionally, the fact that most clients did not identify Plaintiff as their account representative, or that Defendant rejected Plaintiff's alternate explanation for the unauthorized account openings, does not render Defendant's findings unreasonable.  To the contrary, Patterson did as one would reasonably expect—he attempted to determine whether the initial complaint was a one-off event or part of a larger pattern, and when he discovered evidence to support a pattern of misconduct, he cross-referenced the client complaints against internal bank records to confirm that Plaintiff was the account representative associated with the accounts.  *Cf. Burley*, 801 F.3d at 299 ("[Plaintiff's supervisor] took a number of steps one would expect of an investigator who sincerely sought to determine what actually happened.").[4]  Defendant was not required to accept Plaintiff's assertion of innocence in the face of such evidence.

The court finds it useful to compare this case to the Court of Appeals' recent decision in *DeJesus*.  There, the Court of Appeals held that there was a genuine dispute of fact as to whether the defendant's proffered reason for terminating the plaintiff—"willful neglect of duty and insubordination" for both commissioning a study without proper authorization and then providing the results of that study to the wrong client executive—was in fact pretext for race and age discrimination.  *DeJesus*, 2016 WL 6694952, at *4–8.  In so holding, the court relied on the following evidence:  (1) the decision-maker was originally "unperturbed" upon discovering that the plaintiff had commissioned the study without authorization; (2) the decision-maker's suggestion that delivering the report to the wrong executive constituted "willful . . .

---

[4] To the extent that Plaintiff complains Defendant should have involved other investigators, rather than allow Patterson to "play[ ] keystone cop," Pl.'s Opp'n at 34, she offers no evidence that Defendant's choice to rely solely on Patterson violated company policy or was in any way unusual.  Nor has she identified how involving additional investigators would have affected the disciplinary process.  As the Court of Appeals held in *Burley* when addressing a similar argument, "[i]n the absence of any reason to think that [the un-reviewed evidence] could have revealed any material information, no reasonable jury could conclude that failing to obtain and review it was an error so obvious it must have been intentional."  801 F.3d at 300.  So too, here, no reasonable jury could conclude that the failure to involve other investigators constitutes intentional discrimination.

insubordination," when she had only instructed the plaintiff deliver it to "the client," was "so unreasonable that it provoke[d] suspicion of mendacity"; and (3) the reasons provided in the plaintiff's termination letter were contradictory and, thus, appeared "deliberately exaggerated." *Id*. at *4–6.  Based on these three factors, the court determined that a reasonable juror could infer that the proffered non-discriminatory reason for terminating the plaintiff was, in fact, pretext for discrimination.  *Id*.

This case is not at all like *DeJesus*.  First, Patterson immediately reported the client complaint to his supervisor, Bayly, who in turn instructed him to promptly launch an investigation of Plaintiff's conduct.  Second, the Discipline Committee in this case did not wildly overstate the relative seriousness of Plaintiff's offense.  If, as the Committee found, Plaintiff had opened client accounts without consent, then Defendant would have had legitimate grounds for terminating Plaintiff's employment—as Plaintiff herself conceded.  Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25.  Finally, the Discipline Committee's ultimate reason for terminating Plaintiff was not marked by contradiction or confusion, as was the case in *DeJesus*.  Here, Plaintiff was terminated for the very reason that formed the basis of the original client complaint.  Simply put, Plaintiff has not offered any evidence implicating the types of concerns raised in *DeJesus*.

### 2.     *Whether Patterson's Alleged Bias Supports an Inference of Pretext*

Next, Plaintiff claims that Patterson's "ridicule and cruel dismissal of [Plaintiff]" "entitl[es] [her] to an inference of actual bias by Patterson."  Pl.'s Opp'n at 36.  Plaintiff points to four episodes of alleged discriminatory treatment:  (1) Patterson yelled profanities at a group of employees, including Plaintiff, because they could not open the front door and, later that same day, he again used profanities, this time towards Plaintiff after she took a personal call at work; (2) Patterson told employees during a staff meeting that Plaintiff had complained to him about her

compensation and that he was "tired of [her] bullshit,"; (3) Patterson disciplined Plaintiff for leaving early without permission, even though she had explained to Patterson that she felt ill because of her menstrual cycle, and, after trying to explain her health issues to Patterson by telling him to ask his wife, he told her "[m]y mother fucking wife ain't got shit to do with it"; and (4) Patterson refused to allow Plaintiff to take the day off because another female employee was already scheduled to be out that day. *Id*. at 35–36; Def.'s Stmt. ¶¶ 76–80, 82–83.

How these events purportedly establish pretext for gender discrimination is far from clear. Plaintiff does not offer a precise theory.[5]  As best the court can discern, she appears to argue that Patterson's actions are direct evidence of gender discrimination sufficient to entitle her to a jury trial. *Vatel*, 627 F.3d at 1247.  But the record does not support her assertion.

None of the four episodes establishes that Patterson harbored animus towards Plaintiff because of her gender.  His first two ill-mannered comments were directed at all branch employees—including men.  And, while Patterson arguably should not have divulged Plaintiff's complaints about her compensation to other employees, Plaintiff has not provided any evidence to support an inference that Patterson did so because she is a woman.  *See Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (holding that neutral comments cannot form basis of discrimination claim); *see also Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513 (D.C. Cir. 1995) (holding that crude gender-specific comments alone are not sufficient evidence of sex discrimination in cases without "other evidence that gender" is a factor in the challenged employment decision).  Further, even though the third episode Plaintiff cited involved Patterson's insensitive and vulgar reaction to a women's health matter, that episode was not in any way

---

[5] She does not, for instance, assert a "cat's paw" theory, whereby Patterson's gender bias could be imputed to the Discipline Committee's ultimate termination decision.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (explaining elements of a "cat's paw" theory of discrimination).

connected to Plaintiff's termination and, therefore, is less probative of discriminatory animus. *See Neuren*, 43 F.3d at 1513; *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 12 (D.D.C. 2000) ("To be probative, remarks by the decision-maker must have some nexus to the adverse employment decision."); *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 666 (D.D.C. 1997) ("Stray workplace remarks, without a clearly demonstrated nexus to the adverse employment action at issue, are not alone sufficient to withstand a motion for summary judgment."). Finally, Patterson's refusal to allow Plaintiff to take time off because another female employee was out that day provides no probative evidence of his gender bias. Stated simply, while perhaps "harsh, unjust, and rude," Patterson's actions and statements, without more, are too attenuated to Plaintiff's gender and termination to rise to the level of direct evidence of discrimination. *Bryant*, 265 F. Supp. 2d at 63.

### B.     Title VII and ADEA Wage Discrimination Claims

The court turns now to Plaintiff's Title VII and ADEA wage discrimination claims, and considers them together. *See, e.g.*, *St. John v. Napolitano*, 20 F. Supp. 3d 74, 102 (D.D.C. 2013) (explaining that the inquiry for an ADEA claim is "substantially identical" to that under Title VII, allowing courts to evaluate the claims collectively).

As noted, Plaintiff carries the burden of establishing a prima facie case that she was "[a member of] a protected class . . . performing work substantially equally to that of . . . [younger or male] employees . . . who were compensated at higher rates than [she] was." *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999) (internal quotation marks omitted). Plaintiff has satisfied this requirement by offering evidence that David Arriola, a younger, male employee, was paid more

than she was during the relevant period of time.[6]   *See* Pl.'s Opp'n at 38.   The record evidence demonstrates that Defendant hired Arriola as a Relationship Banker Trainee at the Metro Center Branch on June 26, 2006, when he was 26 years old, and compensated him at a monthly salary of $1,500.00.   Bayly Decl. at 25.   At that time, Plaintiff, who was a Relationship Banker II *and responsible for training Arriola*, was being paid far less—$1,361.45 per month.   *Id*. at 23.   Plaintiff was even paid less than Arriola when she received a salary raise, to $1,436.45 per month, in November 2006.   *Id*.; *see id*. at 25.   Further, there is evidence that a second, younger male Relationship Banker ("Unidentified Male Banker") was paid more—$1,416.66 per month—than Plaintiff was—$1,361.45 per month—during the period from May 24, 2006, through November 1, 2006.   Bayly Decl. at 46.

In light of this evidence, Plaintiff has carried her burden of establishing a prima facie case that she was paid less than younger, male employees for performing equal work.   As such, the burden shifts to Defendant to articulate some legitimate non-discriminatory reason for this pay disparity.   *See Anderson*, 180 F.3d at 338.   The court concludes that Defendant has satisfied its burden with respect to Plaintiff's age claim, but not her gender claim.

### 1.     *Defendant's Rebuttal of Plaintiff's ADEA Claim*

Defendant argues that Plaintiff's ADEA wage discrimination claim must fail because Plaintiff's salary was set before she turned 40 years old, meaning that her salary was set *before* she entered a protected age class.   Thus, Defendant contends, the wage disparity that existed after she turned 40 could not have been the product of age discrimination.   Def.'s Reply at 7–8.   The court agrees.

---

[6] Plaintiff also argues that another younger, male employee—a Michael Blackman—was also paid more than her. Pl.'s Opp'n at 38.   However, Plaintiff failed to satisfy her burden as to Blackman, as she presented no evidence in support of her claim.   *Id*.

The ADEA protects individuals who are "at least 40 years of age."  29 U.S.C. § 631(a).  "[A]n unlawful practice occurs, with respect to discrimination in compensation . . . when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discrimination decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice."  *Id.* § 626(d)(3).

Here, it is undisputed that the salary that Plaintiff contends was discriminatory was set *before* she turned 40 years old.  *See* Def.'s Mot. to Dismiss, ECF No. 4, Ex. 1, ECF No. 4-1; Bayly Decl. at 23.  Therefore, to make out her claim under the ADEA, Plaintiff had to offer proof that the wage disparity that persisted after she turned 40—during the time she claims to have been "affected by application of a discriminatory compensation decision or other practice"—was itself the product of age discrimination.  Stated another way, she had to show, through positive evidence, that the reason for the salary disparity after she turned 40 years old was because of her age.  *See Hall*, 175 F.3d at 1077.  But Plaintiff has offered no evidence other than the salary disparity itself to establish discriminatory intent.  Pl.'s Opp'n at 38.  She does not, for example, attempt to show that Defendant somehow sought to preempt an ADEA claim by setting her lower salary just before she turned 40 years old; or, that Defendant refused to pay her equally to younger colleagues after she turned 40 because of her age.  In the face of uncontested evidence that Plaintiff's salary was set at a time when she was not protected under the ADEA, Plaintiff has failed to establish a genuine dispute of fact as to whether the reason for the wage disparity after she turned 40 was because of her age.  Accordingly, the court grants summary judgment in favor of Defendant as to Plaintiff's ADEA wage discrimination claim.

2.      *Defendant's Rebuttal of Plaintiff's Title VII Claim*

The court reaches a different conclusion as to Plaintiff's Title VII wage discrimination claim.  As noted, Plaintiff met her burden of establishing a prima facie case of wage discrimination: Plaintiff showed that she was paid less than two male cohorts, Arriola and the Unidentified Male Banker, both of whom were Relationship Bankers during the relevant time period.  Defendant attempts to rebut Plaintiff's case by arguing that Plaintiff:  (1) "does not know . . . what [the male employees] qualifications or backgrounds were," "admitted that the salary ranges for the Relationship Banker I and II positions overlapped[,] . . . and admitted that a Relationship Banker I or II could be paid at any point in the range depending on experience, qualifications, and performance"; and (2) "does not know who set [the male employees'] pay."  Def.'s Reply at 8 (emphasis omitted).  The crux of Defendant's argument, then, appears to be that Plaintiff's Title VII wage discrimination claim cannot survive summary judgment unless Plaintiff affirmatively establishes both that she shared the same supervisor with her male colleagues and that those male employees did not, in fact, deserve to be paid more than she was paid.

Defendant, however, misunderstands its burden.  Once Plaintiff established a prima facie case of gender-based wage discrimination, the burden shifted to Defendant to offer a non-discriminatory reason for the wage disparity.  *See Anderson*, 180 F.3d at 338.  Here, however, Defendant has done no more than criticize Plaintiff for failing to explain away the mere possibility that there is a non-discriminatory reason for the wage disparity.  It may be true, for example, that Arriola and the Unidentified Male Banker were paid more than Plaintiff because they arrived at the bank with better credentials or possessed skills that Plaintiff lacked, thereby justifying a higher salary.  But Defendant has not come forward with any such evidence.  Indeed, the record is noticeably silent as to Arriola's and Unidentified Male Banker's qualifications.  Additionally,

Defendant's argument regarding who precisely set Plaintiff's salary is immaterial to the court's inquiry—such an argument would only be relevant, if at all, *after* Defendant proffered a legitimate non-discriminatory reason for Plaintiff's termination.  *See, e.g.*, *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016) (explaining that plaintiff may introduce comparator evidence as a means to "discredit [Defendant's non-discriminatory] justification for her termination").  In short, Defendant has failed to rebut Plaintiff's prima facie case.

Accordingly, the court denies Defendant's Motion for Summary Judgment regarding Plaintiff's Title VII wage discrimination claim.

## IV.    CONCLUSION

For the foregoing reasons, the court grants in part and denies in part Defendant's Motion for Summary Judgment.  The court denies Defendant's Motion with respect to Plaintiff's wage discrimination claim under Title VII.  The Motion is granted in all other respects.


Dated:  December 9, 2016                     Amit P. Mehta
                                             United States District Judge